IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

NTCH-WEST TENN, INC.,

    Plaintiff,

v.                                                No. 1:12-cv-1172-JDB-egb

ZTE CORPORATION,

    Defendant.

---

ORDER DISMISSING AS MOOT DEFENDANT'S INITIAL MOTION TO DISMISS (D.E. 10), DISMISSING AS MOOT PLAINTIFF'S MOTION FOR LEAVE TO CONDUCT JURISDICTIONAL DISCOVERY (D.E. 13), GRANTING DEFENDANT'S RENEWED MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR LACK OF PERSONAL JURISDICTION (D.E. 90), AND DISMISSING CASE

---

## I. INTRODUCTION

On August 2, 2012, the Plaintiff, NTCH-West Tenn, Inc. ("NTCH-TN"), brought this action against the Defendant, ZTE Corporation ("ZTE Corp."), alleging state law claims of breach of contract, breach of covenant of good faith and fair dealing, breach of warranties, promissory estoppel, negligence, fraudulent misrepresentation, tortious interference with contract, and unjust enrichment, as well as violation of Tennessee Code Annotated § 47-18-101, *et seq.* On October 24, 2012, ZTE Corp. filed a motion to dismiss the complaint for lack of proper service and personal jurisdiction pursuant to Rules 12(b)(2), 12(b)(4), and 12(b)(5) of the Federal Rules of Civil Procedure. (Docket Entry ("D.E.") 10.) On November 19, 2012, before a response was filed, the Defendant moved for a stay of this action pending the conclusion of arbitration involving NTCH-TN and Defendant's subsidiary, ZTE USA, Inc. ("ZTE USA") (D.E. 16), which was granted in an order entered by United States Magistrate Judge Edward G. Bryant

on July 18, 2013 (D.E. 46), pursuant to an order of reference (D.E. 45). The arbitration, which occurred in August and September 2013, did not encompass Plaintiff's claims against ZTE Corp.

On February 11, 2014, the arbitrator issued a Final Award, as corrected on March 11, 2014, denying the claims of NTCH-TN against ZTE USA. The Final Award was confirmed by the United States District Court for the Middle District of Florida on October 6, 2015. On December 15, 2016, the confirmation was affirmed by the Eleventh Circuit Court of Appeals. In proceedings before the undersigned on February 7, 2017, the parties were advised that the Court would continue the stay until after the March 15, 2017, deadline for appealing the Eleventh Circuit's determination to the United States Supreme Court. (D.E. 82.) Based on notification by Plaintiff's counsel in March 2017 that no petition for certiorari would be filed (D.E. 86) and that this matter would proceed (D.E. 87), the parties were granted permission to supplement previous motions or file new motions (*id.*). On May 11, 2017, the Defendant renewed its motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). (D.E. 90.) The Court assumes the previous motion to dismiss (D.E. 10) is now moot and it is DISMISSED on that basis.

## II. STANDARD OF REVIEW

Dismissal of a complaint for lack of personal jurisdiction is permitted under Rule 12(b)(2) of the Federal Rules of Civil Procedure. The burden of establishing personal jurisdiction over a defendant is borne by the plaintiff. *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 548 (6th Cir. 2016). "In deciding a motion to dismiss for lack of personal jurisdiction, the district court may rely upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct an evidentiary hearing to resolve any apparent factual questions."

*MAG IAS Holdings, Inc. v. Schmuckle,* 854 F.3d 894, 899 (6th Cir. 2017) (quoting *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991)) (internal quotation marks omitted).

"When the district court resolves a Rule 12(b)(2) motion solely on written submissions, the plaintiff's burden is relatively slight, and the plaintiff must make only a prima facie showing that personal jurisdiction exists in order to defeat dismissal."[1] *AlixPartners*, 836 F.3d at 548-49 (quoting *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007)) (internal quotation marks omitted). Plaintiff must make this demonstration by a preponderance of the evidence. *Conn v. Zakharov*, 667 F.3d 705, 711 (6th Cir. 2012). Where a motion to dismiss is supported by affidavits, the plaintiff "may not rest upon allegations or denials in [its] pleadings but [its] response by affidavit or otherwise must set forth specific facts showing that the court has jurisdiction." *Weller v. Cromwell Oil Co.*, 504 F.2d 927, 929-30 (6th Cir. 1974); *see also Flake v. Schrader-Bridgeport Int'l, Inc.*, 538 F. App'x 604, 616-17 (6th Cir. 2013) (same, citing *Weller*). "The pleadings and affidavits submitted must be viewed in a light most favorable to the plaintiff, and the district court should not weigh the controverting assertions of the party seeking dismissal." *AlixPartners*, 836 F.3d at 549 (quoting *Air Prods.*, 503 F.3d at 549) (internal quotation marks omitted). However, "mere conclusory allegations will not satisfy the 'specific facts' requirement." *Preferred Care of Del., Inc. v. Konicov*, Civil Action No. 5:15-cv-88-KKC-EBA, 2016 WL 2593924, at *4 (E.D. Ky. May 4, 2016).

---

[1]In response to the initial motion to dismiss, Plaintiff sought, on November 16, 2012, leave to conduct jurisdictional discovery. (*See* D.E. 13.) However, it did not raise or make any reference to that request in response to the renewed Rule 12(b)(2) motion. Rather, NTCH-TN cited to the legal standard to be used in cases "based on solely written submissions." (D.E. 97 at PageID 2276.) The Court is thus left to assume the request has been abandoned and DISMISSES D.E. 13 as moot. Nor has either party sought an evidentiary hearing. Accordingly, the Court will rule on the motion based on the affidavits and the pleadings.

3

## III. THE COMPLAINT

The complaint contains the following allegations. ZTE Corp., incorporated under the laws of the People's Republic of China, is a manufacturer and supplier of telecommunications equipment, hardware, and related software licenses and support services. The equipment provided and that is the subject of the instant litigation was designed and manufactured by ZTE Corp. in China. In the United States, the Defendant sells its products through ZTE USA, a corporation organized under the laws of the State of New Jersey with its principal place of business in Richardson, Texas.

On September 21, 2006, ZTE USA and PTA-FLA, Inc. ("PTA-FLA"), an affiliate of Plaintiff, entered into an agreement for the purchase of equipment manufactured by ZTE Corp. (the "ZTE Equipment") and for related services in connection with the installation of a cellular telephone network in Jacksonville, Florida (the "Florida Agreement").[2] This agreement included a switch,[3] modules for the switch such as multimedia messaging service ("MMS"), base stations, other necessary equipment, and installation and support services required to bring the equipment online. ZTE Corp. was a newcomer to the United States market and had no equipment in operation in this country. It was represented to PTA-FLA that the ZTE Equipment would be fully functional and compatible with United States standards and equipment and that personnel would be able to install and service the equipment in the United States. ZTE USA also proposed that PTA-FLA (as well as other entities related thereto) purchase remote switches for new

---

[2] Neither NTCH-TN nor ZTE Corp. was a party to the Florida Agreement. (*See* D.E. 1-1 at PageID 14.)

[3] In a related case in this Court brought by NTCH-TN against ZTE USA, Case No. 1:11-cv-01169-JDB-egb, the Plaintiff defined a "switch" as "the brain of a telecommunications network, directing call traffic throughout the network and to other networks." (Case No. 1:11-cv-01169-JDB-egb, D.E. 86-2 at PageID 1935 n.1.)

markets to be developed, including initially Idaho and Tennessee, and take advantage of the primary switch in Jacksonville to operate cellular telephone networks in the developing markets.

After the ZTE Equipment was delivered and installation began, PTA-FLA became aware that it did not in fact meet United States standards as promised or otherwise comply with the Florida Agreement. Specifically, the ZTE Equipment failed to comport with general standards required to provide a quality customer experience; government-mandated standards including those for the Commission on Accreditation of Law Enforcement, Local Number Portability, and E911; and manufacturing-quality certifications, as well as standards for specific platforms, including MMS and PTA-FLA's billing systems. Standard practices for installing such equipment were also not followed, causing network disruption.

PTA-FLA notified ZTE Corp. of the issues surrounding the installation and was assured they would be remedied. In attempting to work with ZTE Corp. to ensure the equipment worked properly, PTA-FLA encountered numerous problems with Defendant's engineers, including missed appointments, limited English-speaking abilities, lack of product familiarity, failure to adhere to United States procedures such as attempting fixes during nighttime maintenance windows when customers would be least affected, and inability to identify and diagnose problems.

In 2008, PTA-FLA sold its network to Metro PCS. Metro PCS refused, however, to purchase the ZTE Equipment and required its removal from the network. In an attempt to mitigate its damages and put the ZTE Equipment to some productive use, PTA-FLA sought to redeploy in alternative markets the ninety-seven base stations purchased from ZTE Corp. for the Florida market. To that end, PTA-FLA purchased two remote switches from ZTE Corp. for a

cellular telephone network to be installed in Jackson, Tennessee, by the Plaintiff. However, ZTE Corp. failed to deliver the switches.

At around the same time, PTA-FLA affiliate Daredevil, Inc. ("Daredevil") was developing a cellular telephone network in St. Louis, Missouri. ZTE USA personnel suggested that the bulk of the primary switch equipment, which was then located in Jacksonville, be moved to Tennessee, and that Daredevil's network and NTCH-TN's Jackson network be configured and engineered to function together. This arrangement was in lieu of the necessity for NTCH-TN to have a remote switch in Tennessee that would operate off a primary switch in Jacksonville.

To implement the arrangement, PTA-FLA assigned its right to the nonfunctioning ZTE Equipment to NTCH-TN. ZTE USA requested that NTCH-TN issue a separate purchase order in the amount of $150,000 for a network "integration fee" to pay for the services of ZTE USA and ZTE Corp. in making the ZTE Equipment operational in Jackson.[4] NTCH-TN issued the purchase order, which was dated June 12, 2009. At that time, ZTE USA owed a credit to PTA-FLA and others affiliated with NTCH-TN in excess of $3.5 million. ZTE USA applied $150,000 of that credit to satisfy NTCH-TN's obligations under the purchase order.

ZTE USA had previously shared technical documents drafted by ZTE Corp. detailing the equipment's capabilities with personnel of PTA-FLA and NTCH-TN. Neither ZTE USA nor ZTE Corp. disclosed to NTCH-TN that the MMS platform previously sold to PTA-FLA and transferred to NTCH-TN was not intended for commercial use. ZTE Corp. promised NTCH-TN that it could fix problems with the ZTE Equipment and that it would ensure its proper functionality for Plaintiff's anticipated utilization. Based on the representations, installation of the ZTE Equipment in Jackson commenced.

---

[4]The vendor listed on the purchase order is ZTE North America. There is no reference on the document to ZTE Corp. (*See* D.E. 1-2 at PageID 53.)

6

However, the ZTE Equipment caused for NTCH-TN the same problems experienced by PTA-FLA. New issues also arose, including improper configuration of Evolution-Data Optimized settings, resulting in significant network disruption and customer loss. Plaintiff was required to suspend all data device sales while this difficulty was being addressed. ZTE Corp. continued to assure NTCH-TN that it would remedy the problems. Nonetheless, the MMS still did not function and, after years of attempts to fix it, ZTE Corp. finally acknowledged the ZTE Equipment was merely a platform for experimentation in the American market.

ZTE Corp. assigned China-based software teams and sent engineers from China to attempt repairs on the ZTE Equipment. NTCH-TN ultimately determined that these individuals were incompetent and unable to complete the work. At its own cost, NTCH-TN engaged the assistance of outside experts, who demonstrated to ZTE Corp. the deficiencies of the ZTE Equipment, spawning another wave of failed attempts at repair and missed deadlines.

Plaintiff then informed ZTE Corp. that it would use a third-party vendor to provide MMS service. ZTE Corp. requested that NTCH-TN postpone this action in order to permit it to fix the problems, which it was again unable to remedy. NTCH-TN was forced to abandon use of the ZTE Equipment because it did not operate properly and the continued malfunctions damaged its reputation with customers. Plaintiff alleged in the complaint that it suffered a loss of some 12,000 customers and months of lost revenues, and was required to replace the ZTE Equipment in its entirety at great expense.

## IV. ANALYSIS

In a case based on diversity, whether a federal court in the forum state has personal jurisdiction over an out-of-state defendant is dependent upon whether the state's courts would have jurisdiction. *Newberry v. Silverman*, 789 F.3d 636, 641 (6th Cir. 2015). "This rule requires

the court to determine whether both the state's long-arm statute and the Due Process Clause of the United States Constitution permit the exercise of jurisdiction." *Id.* (quoting *Aristech Chem. Int'l Ltd. v. Acrylic Fabricators Ltd.*, 138 F.3d 624, 627 (6th Cir. 1998)). As Tennessee's long-arm statute extends to the limit of the Due Process Clause, this Court need only determine whether due process would permit a Tennessee court to exercise specific jurisdiction over ZTE Corp. *See Harmer v. Colom*, 650 F. App'x 267, 272 (6th Cir. 2016).

The Due Process Clause permits two types of personal jurisdiction: general, or "all-purpose," and specific, or "case-linked," jurisdiction. *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., San Francisco Cty.*, 137 S. Ct. 1773, 1779-80 (2017). A court may assert general jurisdiction over foreign entities "to hear any and all claims against them when their affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State." *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014) (internal quotation marks omitted). Plaintiff concedes that this Court has no such jurisdiction over ZTE Corp.

Consequently, the Defendant must be subject to this Court's specific jurisdiction, which requires that ZTE Corp. "have minimum contacts with the state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Maxitrate Tratamento Termico E Controles v. Super Sys., Inc.*, 617 F. App'x 406, 408 (6th Cir.), *cert. denied,* 136 S. Ct. 336 (2015) (internal quotation marks omitted). In considering whether personal jurisdiction exists, the court takes into account a variety of interests, including "the interests of the forum State and of the plaintiff in proceeding with the cause in the plaintiff's forum of choice." *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (quoting *Kulko v. Super. Ct. of Cal., City & Cty. of San Francisco*, 436 U.S. 84, 92 (1978)). "But the primary concern is the burden

on the defendant." *Id.* (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)) (internal quotation marks omitted).

Courts in this Circuit have been provided a three-pronged approach for determining whether minimum contacts exist, set forth in *Southern Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d 374 (6th Cir. 1968). *See Means v. United States Conference of Catholic Bishops*, 836 F.3d 643, 649 (6th Cir. 2016).

> First, the defendant must purposefully avail [it]self of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Id.* (quoting *Southern Machine*, 401 F.2d at 381). If any element is not present, personal jurisdiction may not be exercised. *Miller v. AXA Winterthur Ins. Co.,* 694 F.3d 675, 680 (6th Cir. 2012).

The first element is "essential to a finding of personal jurisdiction," *Means*, 836 F.3d at 649 (internal quotation marks omitted), and has been described as the "constitutional touchstone of personal jurisdiction," *AlixPartners,* 836 F.3d at 550.

> A defendant that has purposefully availed itself of the protection of the forum state has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State.

*Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 150 (6th Cir. 1997) (citing *World-Wide Volkswagen*, 444 U.S. at 297) (internal quotation marks omitted).

In deciding whether purposeful availment has occurred, the court must consider whether the defendant "acted or caused a consequence in [the forum] such that [it] invoked the benefits and protections of [the state's] law." *Schmuckle*, 854 F.3d at 900. This inquiry "ensures that [the

defendant] could have reasonably anticipated being haled into court there" and that it is not brought before a court in the forum "solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) & *LAK, Inc. v. Deer Creek Enters.*, 885 F.2d 1293, 1300 (6th Cir. 1989) (some internal quotation marks omitted). Purposeful availment exists "if the defendant created a substantial connection with the forum state by engaging in significant activities within the State, or by creating continuing obligations to residents in that state." *Id.* (quoting *Burger King*, 471 U.S. at 475-76) (internal quotation marks omitted). Business relationships fall under this umbrella if they are "intended to be ongoing in nature," *id.,* as opposed to a "one-shot affair," *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1265 (6th Cir. 1996); *see also AlixPartners*, 836 F.3d at 551.

> [A] defendant's contacts with the forum State may be intertwined with [its] transactions or interactions with the plaintiff or other parties; a relationship with the plaintiff or third party, standing alone, is an insufficient basis for jurisdiction. Instead, the focus is on the defendant's contacts with the forum State itself.

*Schmuckle*, 854 F.3d at 900 (citing *Walden v. Fiore*, 134 S. Ct. 1115, 1123 (2014)) (internal citation & quotation marks omitted); *see also AlixPartners*, 836 F.3d at 551 ("The minimum contacts analysis focuses on the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."). "[P]rior negotiations, contemplated future consequences, the terms of [a] contract, and the actual course of dealing need be addressed to evaluate, in a 'highly realistic' way, the intended future consequences that are the real object of the business transaction." *Lanier v. Am. Bd. of Endodontics*, 843 F.2d 901, 910 (6th Cir. 1988); *see also Burger King*, 471 U.S. at 479; *Air Prods.*, 503 F.3d at 551.

Even a single act is sufficient to support personal jurisdiction "as long as it creates the required relationship with the forum state." *Fortis Corp. Ins. v. Viken Ship Mgmt.*, 450 F.3d 214, 220-21 (6th Cir. 2006). The nature and quality of such a single act, however, must be examined

through the prism of the Sixth Circuit's purposeful availment precedent. *Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co., Ltd.*, 91 F.3d 790, 794 (6th Cir. 1996).

It appears from its brief that the Plaintiff asserts the Court's exercise of personal jurisdiction over ZTE Corp. is appropriate under two theories: ZTE USA's jurisdictional contacts may be imputed to its parent under an alter-ego theory and Defendant's own contacts with the forum were sufficient to establish personal jurisdiction. The Court will address these contentions in turn.

In the complaint, NTCH-TN alleged that

> [f]rom all appearances, ZTE Corp. dominates ZTE USA to the extent that all substantive decision-making is done by ZTE Corp., ZTE USA is undercapitalized such that at any given time ZTE USA does not maintain accounts with sufficient operating capital to satisfy its obligations, and ZTE USA is merely an alter ego of ZTE Corp.

(D.E. 1 at PageID 6-7.) The Sixth Circuit has recognized that

> it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court.

*Estate of Thomson v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008) (quoting *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002)); *see also ABC Debt Collections, LLC v. Gleason Corp.*, Case No. 16-14225, 2017 WL 2242362, at *4 (E.D. Mich. May 23, 2017) (same). In the parent-subsidiary context, the alter-ego theory "provides that a non-resident parent corporation is amenable to suit in the forum state if the parent company exerts so much control over the subsidiary that the two do not exist as separate entities but are one and the same for purposes of jurisdiction." *Carrier Corp. v. Outokumpu Oyj*,

673 F.3d 430, 450-51 (6th Cir. 2012) (quoting *Estate of Thomson*, 545 F.3d at 362); *see also Indah v. United States Sec. & Exch. Comm'n*, 661 F.3d 914, 921 (6th Cir. 2011).

In support of its motion to dismiss, Defendant has presented the declarations of ZTE Corp. executives Du Jin[5] and Charlie Liang,[6] in which the officials stated that ZTE USA is a wholly-owned subsidiary for the purposes of marketing, distributing, selling, installing, servicing, and supporting telecommunications equipment in the United States. (D.E. 10-5 (Decl. of Du Jin) ¶¶ 15-16 at PageID 407; D.E. 10-6 (Decl. of Charlie Liang) ¶¶ 3, 5-7 at PageID 419.) They further averred that the two corporations are separate and distinct entities that maintain separate, lawful identities (D.E. 10-5 ¶ 14 at PageID 407, D.E. 10-6 ¶ 9 at PageID 420); the subsidiary is adequately capitalized (D.E. 10-5 ¶ 17 at PageID 407, D.E. 10-6 ¶ 8 at PageID 420); there is no commingling of funds (D.E. 10-5 ¶ 20 at PageID 407, D.E. 10-6 ¶ 15 at PageID 420); the parent observes corporate formalities in its relations with the subsidiary (D.E. 10-5 ¶ 20 at PageID 407, D.E. 10-6 ¶ 16 at PageID 420); the companies maintain separate bank accounts (D.E. 10-5 ¶ 20 at PageID 407-08, D.E. 10-6 ¶ 15 at PageID 420); and ZTE USA maintains its own books, records, and corporate minutes; files its own tax returns; and holds separate board meetings (D.E. 10-6 ¶¶ 11, 14, 16 at PageID 420). In addition, Liang asserted in his declaration that ZTE Corp. and ZTE USA hire and pay employees independently and maintain separate marketing departments, offices, and assets. (*Id.* ¶¶ 17-24 at PageID 421).

By way of response, Plaintiff has proffered the declaration of NTCH-TN Development Manager Eric J. Steinmann. With respect to the alter-ego theory, Plaintiff cites to the following portions of Steinmann's declaration:

---

[5] Jin is employed by ZTE Corp. as Legal Director of Division 4. (D.E. 10-5 (Decl. of Du Jin) ¶ 3 at PageID 405.)

[6] Liang is the "Director of CEO Office" for ZTE USA. (D.E. 10-6 (Decl. of Charlie Liang) ¶ 2 at PageID 419.)

> 4. ZTE USA functions as a sales arm of ZTE Corp.
>
> 5. ZTE Corp[.] manufactures and supplies telecommunications equipment, hardware, related software, and related support services to United States markets.
>
> 6. ZTE Corp[.] equipment ships directly from China and requires ZTE Corp[.] engineers from China to develop software, and come to the United States to provide installation and commissioning support as well as trouble shooting software and hardware issues from China and deploying engineers on the ground in the United States.
>
> 7. ZTE Corp[.] sent ZTE Corp[.] engineers from China to Tennessee on multiple occasions to provide support and repair ZTE Corporation equipment.
>
> 11. ZTE Corp[.] employees assured NTCH-TN that it would be capable of remedying the prior problems with the ZTE equipment and make sure the network fully functioned with all [U.S.] regulatory requirements being met.

(D.E. 97-1 (Decl. of Eric J. Steinmann) ¶¶ 4-7, 11 at PageID 2288-89.) Plaintiff maintains in its brief, without citation to the record, that ZTE Corp. "consistently reviewed and directed the operations of ZTE USA . . . in all circumstances." (D.E. 97 (NTCH-West Tenn, Inc.'s Mem. in Opp'n to ZTE Corporation's Renewed Mot. to Dismiss Pl.'s Compl. for Lack of Personal Jurisdiction) at PageID 2279.) It also argues that "ZTE Corp[.] was regularly involved in the negotiations with NTCH-TN and its affiliates," citing paragraphs 6, 7, and 11 of Steinmann's declaration. (*Id.*) As is clear from the quoted paragraphs set forth above, however, that they neither contain nor support such an assertion.

A corporate entity does not purposefully avail itself "merely by owning all or some of a corporation subject to jurisdiction." *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1273-74 (6th Cir. 1998); *see also Knight Capital Partners Corp. v. Henkel AG & Co., KGaA*, ___ F. Supp. 3d ___, 2017 WL 2720005, at *7 (E.D. Mich. June 23, 2017) ("And it is well established that mere corporate affiliation or beneficial ownership of a possibly involved entity by a distinct

corporate entity defendant is insufficient to establish minimum contacts."). NTCH-TN, however, directs the Court's attention to the Sixth Circuit's decision in *Third National Bank in Nashville v. WEDGE Group Inc.*, 882 F.2d 1087 (6th Cir. 1989). In *WEDGE*, the court found appropriate the exercise of specific jurisdiction by a federal court in Tennessee over a foreign parent company arising from the acts of its in-forum subsidiary where the parent held 100 percent ownership of the subsidiary which, along with its own subsidiaries, conducted business in Tennessee; its officers served as directors of the subsidiary and met regularly -- as often as once a month -- in Tennessee to review and direct the subsidiary's operations; it was a party to an agreement with its Tennessee subsidiary, and its Tennessee subsidiaries, to share income tax liability with those Tennessee companies; its officers, in participating in loan negotiations between the plaintiff, a Tennessee bank, and its subsidiary, deposited a check maintained at a Third National Bank branch in the forum state; and it entered into an agreement with plaintiff and the subsidiary which was executed in Tennessee. *WEDGE,* 882 F.2d at 1090. Under these circumstances, even though the parent did not directly conduct business, own property, or have employees in the state, the appellate court had "no hesitancy in concluding that, by these actions and contacts, WEDGE 'purposefully availed' itself of acting and causing consequences in Tennessee and that its contacts with the state were not 'random,' 'fortuitous,' [or] 'attenuated[.]'" *Id.*

Except for ZTE USA's status as a wholly-owned subsidiary of ZTE Corp., the facts of *WEDGE* have nothing in common with those before this Court. Because such status alone falls short of amounting to purposeful availment, *see Dean*, 134 F.3d at 1273-74, personal jurisdiction

over the Defendant in this forum has not been shown on grounds that ZTE USA is an alter-ego of ZTE Corp.[7]

The Court will next consider whether the actions of ZTE Corp. itself constituted purposeful availment. In addition to the portions of Steinmann's declaration set out above,

---

[7]Plaintiff also posits that personal jurisdiction may exist where "the parent holds the subsidiary out as its agent in the forum" (D.E. 97 at PageID 2278-79 (emphasis omitted)), citing *Cupp v. Alberto-Culver USA, Inc.*, 308 F. Supp. 2d 873 (W.D. Tenn. 2004). It argues there is a "strong connection" between the parent and subsidiary to the extent ZTE Corp. "used ZTE USA as its 'middleman' and agent for conducting business in the United States" (D.E. 97 at PageID 2279-80), relying on paragraphs four through seven of Steinmann's declaration (*see supra* page 13).

To the extent NTCH-TN intended to present a separate ground for purposeful availment under agency principles, it fails for several reasons. First, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (internal alterations omitted). The skeletal assertions set forth above are insufficient in the Court's view to comprise a developed independent argument based on agency.

Secondly, Liang and Jin stated in their declarations that "[t]here is no agreement or acknowledgment between ZTE USA and ZTE Corporation that one will act as the other's agent." (D.E. 10-5 ¶ 21 at PageID 408, D.E. 10-6 ¶ 21 at PageID 421.) In the face of these statements, NTCH-TN cannot rely solely on its pleadings, *see Weller*, 504 F.2d at 929-30, and Steinmann's declaration offers nothing to the contrary.

Third, and finally, *Cupp*, if anything, favors the Defendant. In that case, the court articulated:

> Personal jurisdiction must be based on something that the defendant itself has done involving the forum, or on evidence that the presumed corporate separation between parent and subsidiary is a fiction, such as when the parent exercises actual control over the subsidiary, or the parent holds the subsidiary out as its agent in the forum.

*Cupp*, 308 F. Supp. 2d at 878. To illustrate this statement with an example, the court engaged in a discussion of *WEDGE* and found it "entirely distinguishable" from the case before it, in which the defendant parent's control over or connection with its subsidiary consisted solely of ownership. *Id.* at 879. In concluding that Cupp had failed to meet his burden of establishing "even a prima facie showing of facts" to support purposeful availment by the defendant, the court reiterated the principle that "[c]orporate ownership alone is insufficient for the exercise of personal jurisdiction." *Id.*

Plaintiff points to the following in support of the Court's exercise of jurisdiction over ZTE Corp. arising from its own actions:

> 8. ZTE Corp[.] promised that its equipment would meet United States standards, which include UL certification.
>
> 9. ZTE Corp[.] did not meet UL certification standards and attempted to fraudulently put UL stickers on ZTE Equipment in China. A ZTE USA employee told ZTE Corp[.] that this was improper and the stickers should not be placed on the equipment.
>
> 10. The engineers from China that ZTE Corp[.] sent to Tennessee were unable to repair or make functional all network capabilities and NTCH-TN eventually was required to engage a third-party to make certain capabilities functional. This cost was not planned for in NTCH-TN's budget.
>
> \*   \*   \*
>
> 12. ZTE Corp[.] was either incapable or unwilling to make the network in Tennessee fully functional.

(D.E. 97-1 ¶¶ 8-10, 12 at PageID 2289.) NTCH-TN also cites to an internal email chain involving ZTE Corp. and ZTE USA personnel in November 2009. From the content of the emails, one could infer that ZTE Corp. knew the equipment was not suitable for commercial use, a fact of which ZTE USA was not aware until that time. (*See* D.E. 96-4 (NTCH-West Tenn, Inc.'s Resp. to ZTE Corporation's Statement of Undisputed Facts in Supp. of its Mot. for Summ. J.; NTCH-West Tenn, Inc.'s Statement of Undisputed Facts in Supp. of its Mem. in Opp'n to ZTE Corporation's Mot. for Summ. J., Ex.) at PageID 2235-43.)

Jin, in his declaration, identified the movant's only contact with the forum as service support provided to ZTE USA in Tennessee on three occasions in 2009.[8] (D.E. 10-5 ¶ 91 at

---

[8] As the Plaintiff recognizes, "[a] numerical count of the [contacts] has no talismanic significance." *LAK*, 885 F.2d at 1301. Rather, "[t]he quality of the contacts as demonstrating purposeful availment is the issue, not their number . . ." *Id.*

PageID 413.) He added that Defendant never entered into a contract with, took any purchase orders from, or delivered equipment to NTCH-TN. (*Id.* ¶¶ 150-51 at PageID 417-18.)

As noted herein, it is undisputed there was no written contract between ZTE Corp. and NTCH-TN. Nor, for the reasons set forth in the previous discussion concerning alter-ego, may contractual arrangements entered into by ZTE USA be imputed to its parent. Plaintiff asserts, however, that the Defendant's promise to provide software support in China, equipment manufactured in China, and technical support in Tennessee in an attempt to fix the ZTE Equipment and make the network functional formed the basis of a separate, presumably oral, contract with NTCH-TN. The mere fact that one enters into a contract is insufficient, without more, to establish purposeful availment. *Kerry Steel*, 106 F.3d at 151. Instead, the Court must determine whether ZTE Corp. intended to create a continuing, ongoing relationship with the forum.

In its brief, the Plaintiff points to ZTE Corp.'s "regular[] involve[ment] in the negotiations with NTCH-TN and its affiliates . . ." as evidence of purposeful availment. (D.E. 97 at PageID 2279.) To the extent the nonmovant is referring to discussions between the parties to this action other than those relative to repairs to the ZTE Equipment, such a claim is not supported by the complaint or Steinmann's declaration.

In looking at prior negotiations, contemplated future consequences, terms of any agreement, and the actual course of dealing between these parties, the Court finds that the relationship falls into the category of a "one-shot affair." Indeed, the Plaintiff appears to agree with this characterization based on its reliance on the proposition that a single act can constitute purposeful availment. The oft-cited case accompanying such assertions, which has also been referenced here by NTCH-TN, is *McGee v. International Life Insurance Co.*, 355 U.S. 220

(1957). Therein, the plaintiff was the beneficiary under a life insurance policy purchased by her son, who had died by suicide. *McGee*, 355 U.S. at 221-22. The plaintiff, Lulu McGee, and the decedent lived in California. *Id.* The insurance carrier, which refused to pay the claim, was located in Texas and had never maintained offices or agents in California. *Id.* Nor was there evidence to show the defendant had ever solicited or engaged in any insurance business in the forum aside from the policy issued to McGee's son. *Id.* at 222. The Supreme Court held that the California courts had personal jurisdiction over the insurer based on a contract that had a "substantial connection" with the state. *Id.* at 223. The Court explained its position thusly:

> It cannot be denied that California has a manifest interest in providing effective means of redress for its residents when their insurers refuse to pay claims. These residents would be at a severe disadvantage if they were forced to follow the insurance company to a distant State in order to hold it legally accountable. When claims were small or moderate individual claimants frequently could not afford the cost of bringing an action in a foreign forum -- thus in effect making the company judgment proof.

*Id.*

In *Tryg*, the Sixth Circuit observed that *McGee* "represents perhaps the broadest application of the test set forth in" minimum contacts jurisprudence. *Tryg*, 91 F.3d at 796. The court noted that the concerns leading to the Supreme Court's holding in *McGee* did not exist in the case before it, where the plaintiff was not an individual but a large insurance corporation "able to afford to travel to the defendant's jurisdiction to obtain redress," even if that travel was to another country. *Id.* at 796-97. In distinguishing *McGee*, the appellate court also recognized that the *McGee* Court did not have before it the circumstance of a foreign defendant and the "special concerns" that arise in such cases. *Id.* at 797. As the Supreme Court cautioned in *Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County*, 480 U.S. 102, 114 (1987), "[t]he unique burdens placed upon one who must defend [it]self in a foreign legal system

should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *See Tryg*, 91 F.3d at 797.

Here, there is no evidence that the Defendant intended to create a relationship with Tennessee or its residents that was ongoing in nature. *See Kerry Steel*, 106 F.3d at 151 (where the record shows only an "isolated transaction" without evidence of an intent to create an ongoing relationship in the forum state, purposeful availment has not been established). Neither has Plaintiff contended that the commerce of the State of Tennessee has been affected. While NTCH-TN itself was financially affected in a negative way, that fact does not create purposeful availment. As the court noted in *Kerry Steel*, "the locus of such a monetary injury is immaterial, as long as the obligation did not arise from a privilege the defendant exercised in the forum state." *Id.* (quoting *LAK*, 885 F.2d at 1303) (internal alteration & quotation marks omitted). Moreover, considering the corporate nature of the Plaintiff, it does not appear to the Court that it is unable to pursue its claims against the Defendant in a forum where personal jurisdiction is not an issue.

Thus, the Court finds Plaintiff has failed to demonstrate a prima facie case of purposeful availment. In light of that finding, the Court need not continue through the remaining *Southern Machine* elements. *See LAK*, 885 F.2d at 1303 ("The plaintiff having failed to pass the 'purposeful availment' test, we need not dwell on the other criteria of [*Southern Machine*][.]"). That said, the Court deems it necessary to comment on one of the arguments presented with respect to the reasonableness prong -- that NTCH-TN will have no other remedy for the righting of the wrongs it claims. While the Court is not unsympathetic to Plaintiff's plight, it simply cannot exercise personal jurisdiction over the Defendant absent purposeful availment.

## V. CONCLUSION

For the reasons articulated herein, the Defendant's motion to dismiss filed October 24, 2012, (D.E. 10) and Plaintiff's motion for leave to conduct jurisdictional discovery filed November 16, 2012, (D.E. 13) are DISMISSED as moot; Defendant's May 11, 2017, renewed motion to dismiss for lack of personal jurisdiction (D.E. 90) is GRANTED; and this action is DISMISSED in its entirety. The Clerk is DIRECTED to enter judgment in favor of the Defendant and to remove all remaining motions from pending status.

IT IS SO ORDERED this 9th day of November 2017.

s/ J. DANIEL BREEN<br>
UNITED STATES DISTRICT JUDGE